Good morning, Your Honors. May it please the Court, my name is Jed Rubenfeld, and I'm representing Sullivan's Health Defense, the plaintiff and appellant in this action. We'd like to reserve five minutes of our time for rebuttal, and in just a few minutes I'll be turning over my spot to my co-counsel and CHD's chairman, Mr. Robert F. Kennedy, Jr. Your Honors, everybody in this courtroom knows that the Internet is the modern public square, and that the gatekeepers of this square engage in censorship, viewpoint-based censorship. But, Your Honors, this morning, on this appeal, the question is much narrower. That kind of censorship may be the gravest threat to freedom of speech in America today, but the question today is a simple one. We're not arguing that Facebook is a state actor for all purposes. This is a 12p6 motion, and all we're asking for is a very narrow ruling, one dictated by established law, and that ruling is this, that where the plaintiff comes forward with specific, plausible allegations that, one, Facebook has entered into an agreement, an actual agreement with the government, with the White House itself, to censor a whole category of speech that the government doesn't want people to hear. Some of that activity that you've identified seems to postdate some of the challenge conduct. Doesn't that present a problem? No, Your Honor. Respectfully, I don't think it does. That statement is made in Facebook's brief. It's just not true, as a matter of fact. It postdates some, but the most important single act of censorship in this case is the deplatforming of Mr. Kennedy. When Facebook terminated its 800,000-follower Instagram account on February 2nd. Does CHT have standing to assert that deplatforming, or would it need to be added as an additional plaintiff? Oh, I think that question is a pretty open and shut one, Your Honor. We do have standing. So, in the Alamo Foundation case out of the Supreme Court, the court held that foundations have standing to assert the rights of their officers. Mr. Kennedy is the chairman of CHT, and we have standing. In this court, in the Hacaluna case, held that foundations have the right to assert the First Amendment rights of their associates and employees. So, I think we clearly have standing to assert the injury of Mr. Kennedy's First Amendment rights, which, in turn, are extremely injurious to CHT itself. Mr. Kennedy is the chief spokesman for CHT, as well as its chairman and fundraiser, and it has reputational and monetary harm to have him deplatformed from Instagram. Now, that deplatforming happened on February 10th, 2021, after the agreement, which I was just mentioning, was entered into between the White House and Facebook to censor a whole category of speech. So, we have an agreement to censor a whole category of speech. We have action on that agreement just a few days later, and in this case, plaintiff alleges that these allegations must, of course, be taken as true for purposes of this motion. The government actually told Facebook, the White House told Facebook to censor Mr. Kennedy, to deplatform him. By name, specifically. When did they say that? Twice, Your Honor. Most importantly, there's a letter, which mentions Mr. Kennedy by name, sent by two senators to Facebook. But most importantly— Yeah, but you're equating a letter sent by two senators to the government. No. Most importantly, I just wanted the court to be aware of that. Most importantly, the White House press secretary, Ms. Psaki, said, specifically, she admitted that Facebook had—the government, the White House, had contacted Facebook and asked them to deplatform 12 individuals, one of whom was Mr. Kennedy. That's a specific reference. In fact, she said some of these people still have one account on one platform when they've been deplatformed from another. And the only person satisfying that description was Mr. Kennedy. This is a specific reference to Mr. Kennedy. They asked—the White House asks Facebook to deplatform him. And, by the way, that is not— Deplatform him from the deplatforming Instagram. And from Instagram, they specifically asked for that. The deplatforming from Instagram occurred on February 10th of 2021. That's an 800,000-follower count. The agreement between Facebook and the White House was reached days before that. And this is—this is our allegation. It should be taken as true on this motion. But this is from admissions made by the White House and Facebook itself from late January, early February, saying, the White House says, we reached out to Facebook and asked them for their assistance. Would they help us? Would they help us stamp out and get rid of what they call COVID misinformation? Facebook says they got back to the White House. They say, we agree to provide any assistance we can. That's requests and acceptance. That's an agreement. Right there, it's an agreement. It's not an agreement to do something specific. It's an agreement to— In other words, we agree in general to help them. But in terms of each specific act that was—that you were complaining about, did they say deplatform him from Instagram? Did they say cut off the button that allows people to donate, I believe, on Facebook? Did they tell them to take any specific action as opposed to voicing concerns about what they described as the false information that is being disseminated on social media and Facebook? Well, respectfully, Your Honor, I would say two things. One, yes, they did. Yes, they did ask for a specific deplatforming, Mr. Kennedy. Very unusual, but not legally necessary. They did ask for it, but not legally necessary. If the government agrees with private airlines to search every bag that fits a certain profile or every bag on less than probable causes— Well, that's a specific thing. I'm sorry, but if the airline agreed and did it, the fact that the government did not direct them to take any specific search would not mean that the searches were not state action at this point. And when you just said that the government asked the airlines to take that specific act— The specific act here is to censor COVID misinformation, and the analogy is— Well, that's pretty general. Well, I don't know why it's general, Your Honor. The CDC is identifying what counts as misinformation. Facebook says that they take the CDC's statements for what counts as misinformation and use that to censor their platform. And CHD and Mr. Kennedy were caught up in that net. And again, it's just like an airline. If an airline said, we're going to search all bags of passengers meeting a certain profile, the fact that they didn't say, search this bag, wouldn't mean that a passenger would fit the profile, couldn't raise the Fourth Amendment claim. And suppose there were a national newspaper whose editors just really, really like the current administration. This is a hypothetical. And you could come up with evidence that the reporters meet with administration officials and lots of examples of the press secretary says X, and then a couple days later they'll run an editorial saying, you know, that's great. And they publish lots of different op-eds by different people, but they never allow anything that deviates from the party line. Would a, you know, a would-be op-ed contributor who they refuse to publish have a First Amendment claim against the newspaper as a state actor because of its coordination with the government? Obviously a central, excellent question, Your Honor. But I believe the line is crossed in two ways. One, with the formation of an agreement. That's what this court has held. Just last year in the Atkinson case, another Facebook case, the Atkinson case just last year, this court stated expressly, plaintiff does not offer facts that would make a joint action claim plausible, such as an agreement between the government and meta platforms. That's this court's statement in Atkinson. Of course, that's just what we allege. So if, in your hypothetical, Your Honor, the government entered into an agreement, hey, will you work with us? Can we have a partnership to not allow those op-eds to be published? And the peers said, yeah, we'll do that. Let's agree. We'll do it. We're in. Count us in. That's what Facebook did. So an agreement is one, and coercive pressure is the other. We have numerous allegations in this case of repeated threats made by powerful governmental actors. Well, I mean, I don't see this. I mean, you rely on some letter by Adam Schiff, a small, you know, who represents one of about 50 congressional districts in California. No, sir. Letters from a small number of senators. No, sir. We rely on Is that serious? I think it is, sir. We rely on repeated statements made at hearing after hearing by the Senate Antitrust Committee, the Senate Commerce Committee, the House Commerce Committee. Statements made publicly. That's one. These are individual members of one branch of the government. This now constitutes conduct by the government of the United States. It's one thing when Congress passes a statute, possibly even a resolution. But what you're relying on is, I mean, Justice Scalia, in a slightly different context, talking about what deference should be paid to statements made by members of Congress on the floor regarding bills, you know, showed that this was all a joke. Oh, I don't think it's a joke. In terms of congressional intent. I find this almost unbelievable that you're making this argument that this is the government. I'm sorry that you find it unbelievable, sir, but the test is whether an objective person would interpret the statements reasonably as an intimation. The government consequences might follow. That's the test from the Second Circuit adopted by this court in the American family case. And when the Speaker of the House, the Chairman of the Antitrust Committee, the whole House Commerce Committee says to you that we're going to legislate to hold you accountable and take away these million-dollar advantages you have if you don't do X, I would think it's reasonable for the company being so threatened to think they mean it. And with that, Your Honors, I'm going to turn things over to my co-counsel, Mr. Kennedy. Thank you. Thank you, Counselor. Mr. Kennedy? Mr. Kennedy, you are muted. Your Honors, excuse my voice, which is really bad today. I want to address Judge Corman's question about whether that is a positive threat coming from the United States and from these key chairs of committees, from the Speaker of the House to the White House, the chairs of key committees with the capacity to destroy, to financially annihilate this company, promising, again and again, and subpoenaing Zuckerberg before Congress and telling him repeatedly, again and again, if you do not censor CHD and Mr. Kennedy for this category of speech, which is not, by the way, CHD, which we ought to have the capacity to destroy, we have never posted a single item of misinformation about the COVID countermeasures of vaccines. You have sent the key chairs of the key committees of House and Senate saying to Mark Zuckerberg, we are going to end your Section 230 of the Kennedy, which is the heart and soul of the business model of that company. It is financial annihilation of that company. If you do not censor these people, that is authentic threat. You cannot get a more real threat. They also threaten him with antitrust enforcement. These were not empty threats. These were a unanimity in the most powerful members of those committees, in some cases, majority committees, as well as the White House, telling him, here is specifically what we are going to do to you. If you do not make yourself a surrogate for a government censorship campaign, you are under one of the foundations of American democracy. It is the assumption that Americans ought to be able to criticize their governments and that governments that have the capacity to silence and criticize them have the right to commit any atrocity. Here, Mark Zuckerberg becomes a beast, has been by virtue of a direct, explicit agreement, and has made himself a surrogate in a government censorship campaign. And that is something that we ought to give and prove at trial. Thank you, Your Honor. I reserve the rest of our time for rebuttal. Thank you, Mr. Kennedy. Ms. Mehta. May it please the Court. Selma Mehta on behalf of Appellees, Meta Platforms, Inc., and Mr. Zuckerberg. I want to take a step back and focus on the issue that was presented to the district court and the legal issue that is presented to this court, and that is whether taking the factual allegations and all plausible inferences as true, CHD has stated a claim of state action or a statutory claim which has met the 12B6 requirements for pleading. And I think the critical issue on which the district court granted focus, and we would urge this court to focus, is what are the specific factual allegations that could give rise to a claim of state action under either a joint action or coercion theory? We can also consider some of the additional materials that were submitted that are reflective of what a further amendment could have shown. So some of the things are attachments to declarations. We've said that you can consider those. So that's part of the mix in terms of applying it all, right? Yes, Judge Collins, they are. And the district court did exactly that. Judge Ilston looked at all of the supplementary materials that followed the second amendment complaint. And viewed it as essentially a proffer as to what could have been done if an amendment had been allowed. And nothing that is in those supplementary materials changes the state action analysis in any way because ultimately there is not. What about the comment in, you know, February 19th, 2021 report that the Biden administration was talking to social media companies so they understand the importance of misinformation and disinformation and how they can get rid of it quickly? Is that kind of coordination between the government and a platform operator does not implicate state action concerns? No, Your Honor, it does not. And the reason for that is even accepting that allegation is true. That suggests common interests in a problem and maybe even coordination to look into the problem. But what it doesn't do is come anywhere close to the standard for state action or under MAFIS. But how do you distinguish Skinner? I mean, because Skinner is against the background of immunity. And so the platform operates essentially, an essential part of its ability to operate and to manage other people's speech is the immunity conferred by Section 230. So you have the immunity and then you have coordination with the government in terms of removing information the government doesn't like. The government defines what it considers to be misinformation and then the platform takes it down. That's not enough to fit within Skinner. So I have two responses to that, Your Honor. One is, actually, I would dispute the second part of that question and I'll explain why in just a moment. But secondly, even if I accept all of those allegations at face value, the answer is no. The part that I dispute is that the government said, this is what we want you to take down. And that's the critical distinction between the facts alleged and all plausible inferences here and the types of cases in which you might find joint action. Unlike the Ninth Circuit's decision in MAFIS, there was nothing here in the statements that are alleged that defines any particular rule of decision or would compel any particular result with respect to CHD or with respect to any after. The statements that the CDC makes, for example, about vaccination are not considered as part of what constitutes misinformation. Inconsistency with the CDC statements is irrelevant to the misinformation determination? No, Your Honor, but it doesn't compel the results. And what I mean by that is a private actor like MEDA or like its third-party fact-checkers could have, of course, consult the CDC or anyone as a source of information on what is accurate or not accurate when it comes to public health. But that doesn't define what the decision would be in any particular case. Does it have to amount to compulsion? I mean, when you have this background immunity and then you have coordination with the government and then you have various powerful members of Congress saying, effectively, nice immunity you have there. Shame if anything ever happened to it. That isn't enough to cross the line in Skinner. So there are two responses, Your Honor. The first is, it's not enough to tease apart those things and then we can talk about them all together. It is not enough for the federal government to say, we're interested in finding misinformation. We want you to take steps to combat misinformation. Under this court's precedent in Mathis and under Blum from the Supreme Court, there has to be evidence or here, in this case, an allegation that's plausible that they so influenced the decision that the choice must be in law and duty to be that of the government. And in what we found, what the court found in Mathis was there has to have been a standard that was applied that would compel the result. It's not enough to state the general interest in our problem. The fact that there is an independent statutory immunity that has nothing to do with vaccine misinformation or CHD or any of the conduct challenged here  that allows the content platform like Meta to publish or not publish doesn't change that analysis because, again, there's no connection between that immunity and the actual decision here or the standards that were applied here by Meta or by its third-party fact-checkers. Nor would the statements that are alleged to be coercive change that analysis because statements from an independent legislator are not, even if they did amount to a threat, which I don't think is a plausible inference from letters. They're simply asking questions. Even if they're aggressively phrased questions about whether or not platforms are doing enough to combat misinformation or whether or not platforms should be subject to Section 230 immunity, even if you take those questions and those signals of interest from individual legislators at face value and you say, yes, those are threats, a statement from an individual legislator that doesn't have the power to do anything isn't coercive. And coupling that with a neutral immunity that doesn't have anything to do with a specific challenge action or defining a rule of decision with respect to challenge action and coupling that with general statements of a joint interest in a regulatory problem, even altogether, none of those things, or the totality of those things, would not amount to state action because there's no connection or causal nexus between all of those things and the actual state action here that would yield the result that you need under Plum or under Mathis, which is that it was the government's choice. If there was a specific conversation between Mr. Zuckerberg and a government official about deplatforming Mr. Kennedy from Instagram followed by his deplatforming, is it your position that that would not be enough to establish state action? So, first of all, Your Honor, that's not the timeline. I think there may be some confusion about... Well, I'm giving you a hypothetical, so I want to know the answer to that because I want to know where your line is between joint interest, coordination, and state action. So if there was a conversation in which a government actor said, you know, we really think you should take a hard look at Mr. Kennedy's page and have concerns about it, and then a platform made its own judgment to take action, that wouldn't be joint action because the government has not, in that case, inserted itself into the decision. If the government said, here's a set of rules that we want you to apply, and under these rules you're necessarily going to have to take action against Mr. Kennedy by name or by virtue of the rules defined, the outcome would be mandated that that particular content would come down or be labeled, then I think you'd be in a joint action situation. Here, what is alleged, and the timeline is important, what is alleged is that there were general statements about combating misinformation. Then Mr. Kennedy was de-platformed for Instagram, not for Facebook. Then there was a letter from Senator Klobuchar asking questions about why certain individuals were continuing to be permitted to be on the platforms, and then months later there was a statement from the White House Press Secretary that was referenced in a prior argument for my friend in which there were some questions raised about certain individuals. But the only thing that predated the de-platforming of Mr. Kennedy from Instagram in that whole chronology was the general discussion about combating misinformation. There was no... Can I ask you, suppose, I mean, this is a variation on the hypothetical from Judge Collins, suppose the government says, you know, we're going to start, you know, this new office in DHS, we're going to start promulgating a list of, you know, people who are spreading misinformation, and they go to you and they say, will you agree to de-platform the people on the list? And you say, you know, sure, we're with you. And then they start publishing the list and periodically they update it, and then Facebook follows the list,  they get rid of the people who are on the list. Would that be sufficient joint action to constitute state action? I think it would depend a little bit on the rest of the circumstances around that, including whether there's independent judgment being made by the platform. So, for example, if there is a list and it's given to the platform, and the platform says, yes, sir, yes, ma'am, we're going to de-platform these people, and there's no judgment or discretion that's being independently applied, I think that looks a lot more like what would constitute state action under a joint action theory. But if there's a list of people that are provided by some state actor, the state actor says, we have an interest in fighting misinformation, you share that interest, and we're concerned these people might be promulgating misinformation on the platform, and then there is independent professional judgment exercised by the platform to evaluate whether or not those people are actually promulgating misinformation, and they're using independent criteria, not some preset matrix where they simply just apply the formula that the government gave them, then that wouldn't be like this. That would be a joint action. Wasn't there independent judgment in Skinner whether to undertake the drug testing? It wasn't compelled in Skinner. It was just that they created a framework where they gave them the immunity and encouraged and made clear that they wanted it, and the Supreme Court said that was enough. Yes, Your Honor, in Skinner, what the Supreme Court found was that there was a significant thumb on the scale in terms of what the desired outcome would be, and here, the immunity, a Section 230 immunity that is provided is only provided to give them the ability to exercise their own discretion to decide what to publish or not to publish without legal consequences under the statute. It doesn't say you should go about, this immunity is protecting you so that when we do the thing we want you to do, you're immunized from doing it. It's a thing of... Well, let me say that as a practical matter. You could not operate the platform, and you could not exercise the control you do over communications on the platform if Section 230 were repealed. Isn't that a fair statement? I don't know that that's true, Judge Holmes. You had the Stratton-Oakbound problem again. I mean, that led to this statute. You'd be paralyzed. You'd shut it down, and you'd need to aggressively take on everything. Well, Judge Holmes, I think there's other rights at play, including the person having rights at the platforms themselves, but none of that goes to the question at issue here. Even if I accept the premise of the question for purposes of our discussion, that the platforms need 230, the fact that the platforms are given a neutral immunity doesn't create state action for purposes of decisions about how to actually... It's an immunity to give you a free hand in taking down speech. That's what the immunity is. And so the government creates the immunity to allow you to take down speech, and then it tells you what speech it wants you to take down. And because you exercise independent judgment in accepting the government's conclusions, there's no state action. Is that your position? No, Your Honor, and I think there's a missing piece to that, which is what Section 230 says is that the platforms have a statutory immunity to publish or to not publish. So it is not the case that the statutory immunity only protects decisions to take things down. It also protects decisions to leave things up. But it says you're not the publisher of the things you leave up. I mean, that's a curious thing. For First Amendment purposes, you pretend you're a big magazine with 50 million writers of articles, but you're not the publisher of any of them for any purpose other than the ability to take them down. So, Your Honor, I think the fundamental premise of the question as to Skinner is in Skinner there was a particular immunity, and what it did was prevent the railroads from barging away the right to do things, and it pushed towards a particular result. And Section 230... And didn't the government actually want the fruits of the testing? It did, Your Honor, it did. And it was all directed to a particular end result, and that's why in Skinner the immunity was just a piece of the overall government state action. Here, Section 230, and I know I'm over time, so I'll finish the response to your question, Your Honor. Section 230 is neutral as to whether or not you are leaving things up or taking things down. And the fact that there is discussion amongst legislators individual legislators about whether or not 230 should continue in its current form doesn't amount to coercion, and certainly can't amount to joint action with respect to combating misinformation, which has to go to an actual specific action here with respect to CHP or Mr. Kennedy that was jointly done by the government in a way that would, under the Supreme Court's precedent in Blum, show that the choice must be in law to be deemed that of the government. And that is what is missing, and Section 230 and neutral immunity doesn't change that. It simply cannot change that. Thank you, Ms. Mehta. Mr. Karamanicka. Good morning, Your Honor. May it please the Court, Mark Karamanicka for the Poynter Institute for Media Studies, Inc. In my limited time here, I'd just like to focus on exactly who Poynter is, what it does, why it's been sued here, and the sort of allegations against it and how they relate to the claims that have been asserted. Poynter Institute practices journalism. It's done that for decades. And some of the things that it does that are relevant here, it operates the branded News Service PolitiFact, which does fact-checking journalism, which is essentially reporting on other people's content and the accuracy of that content. In 2015, two years before CHD even started a Facebook page, it founded the International Fact-Check Network, which is basically a private certification body for fact-checkers. So why is it being sued here? It's being sued here mainly, as the district court noted, because it conducted a single fact-check on content that CHD shared on its page that was published by a third party of Collective Evolution that fact-check rated the headline of the subject article as false and misleading. Ultimately, as it's shown in the record, the third party agreed with that criticism and actually changed the headline. Nonetheless, we've now been sued under multiple counts. But the allegations against us are really bare. It really boils down to the fact that we did disagree to fact-check on third-party content, not about CHD, that we run the IFCN, which, according to CHD, exists to anoint other fact-checkers to go out and discredit CHD, and essentially that we've, in the past, received some funding from NEDA, from the U.S. State Department, and the National Endowment for Democracy, which is essentially some congressionally allocated Department of State money. That's why we're here. And, frankly, the allegations do not get us to where we are in terms of linking us to government action. There's been a lot of discussion about that in the argument today. There's not a single allegation that Poynter was in any way asked by the government to do its bidding, any sort of coercion by the government, no allegations of coordination. And to be clear, I'm not suggesting. I think the district court got it right when they dismissed Mr. Zuckerberg in Facebook. But as applied to us, those allegations are so far removed. We've been swept up in this. Does Poynter, with respect to any of the conduct at issue in this case, assert that it is protected by Section 230 immunity, or does it concede that because it's its own speech, that's not really an issue with respect to Poynter? The platform has Section 230 immunity, generally under 230 immunity. The speaker itself is not subject to those types of protections. But here, again, we had a criticism of fact check that was agreed to. There's no debate here that, and if you go to the fact check, you'll see Poynter lays out all the bases. You can click, go through to their website. It lays out all the bases and sources for how they made that determination that the headline was false and misleading. And Collective Evolution agreed with that. So, you know, as far as the accuracy of the fact check, it's our position that that's a non-issue. Thank you, Counsel. Mr. Rubenfeld. Thank you, Your Honors. I'd like to make just two points on rebuttal first to Judge Collins' point. This case is, just like Skinner, only stronger. The Skinner case involved an immunity provision like Section 230, and as the Court emphasized, the government made it plain that they had a strong preference that the private actor engage in the conduct that was immunized. We have exactly the same thing here, repeated expressions of strong preference that the Big Tech platform censored. And Skinner also, and also, and the Court isn't requiring the language of the Court, but also its desire to share the fruits of such intrusions. Yes, exactly, Your Honor. In other words, it was encouraging it, but it also was essentially wanting to be a partner. Yes, and that's exactly right. In the actual conduct. Well, I don't know. Which is why I asked you at the beginning of what specifically was done, did anybody ask that the government, however you wanted to find the term, and in my view, you're way off the charts, did the government say take Instagram off, delist it, whatever the phrase is, or did it say stop Facebook from being able to allow people to press a button to give a donation, or is it simply that the government was voiced concern during a pandemic that's killed a million people in the United States about information that it had reason, it was concerned about accurate information and inaccurate information that was being disseminated. And is it your view that any time the CDC voices concern about a particular comment that's made or the accuracy of it, that that's somehow governmental action because of the existence of Section 230, which was enacted long before this particular events occurred? Yes, Your Honor. So, first of all, the government is very much sharing the fruits of CHC censorship. It helps the government achieve its policy directives and insulates the government from criticism. Number two, it is serious. Yes, yes, Your Honor, I'm quite serious. And I would also like to stress, and this goes to Judge Miller's question, my friend is describing this case as if it's a post-trial case. This is 12B6. We are entitled to discovery on the very issues, Judge Corman, that you're quite properly raising. We are entitled to discovery on whether the agreement was of the form that Judge Miller was suggesting. Will you do this? Yes, we'll do it. If we put up the list, yes, we'll do it. But you allege that in your complaint. Yes, we allege that Facebook is telling, that the White House is telling, the CDC is telling Facebook, here's the disinformation, here's what counts as disinformation. Facebook has admitted that we are advised by public health officials. So we're alleging that CDC tells Facebook, here's what counts as disinformation. Like, for example, the virus didn't originate in the Wuhan lab, which then becomes verboten on Facebook. We'll say it on that front. Can I ask about Poynter? Because what's your response that Poynter is differently situated, that you just don't have the kind of allegations of state action with respect to Poynter that you have with respect to Meta? What's your response to that? Your Honor, we have alleged in the brief that Poynter and the other so-called independent fact-checkers employed by Facebook are not independent. They are Facebook's agents. We have alleged that they're Facebook's agents, bought and paid for. Those allegations are not refuted by anything in the record and should be taken as true. So Poynter is sued as an agent of Facebook and, therefore, in our view, is liable for all the actions taken in concert with Facebook. Why isn't the more natural interpretation of what's happening here that, you know, you've got a group of people at Facebook who are having to make these decisions about content moderation, and, you know, they're people who generally, you know, agree with the sort of people who are at the government, and it's not that they're being comprecoursed. It's not that they're in cahoots. It's just that they have a similar view of the world, and so when they're thinking to themselves, well, we want to take down what we consider to be misinformation, and, you know, we think that the CDC is the place to look for identifying that. And it seems to me that there's a significant First Amendment cost in telling them that they can't use their platform to promote their own view of the world. So why is that not the right way to look at it? Well, I think, Your Honor, it's putting your finger right on the central question. So, once again, I would say that the evidence and specific allegations of agreement and the evidence and specific allegations of coercive pressure make all the difference here, not because we've established anything. These are disputed questions of fact. Your Honor is suggesting, I would say as a hypothetical, that if Facebook is indeed exercising independent editorial judgment and just doing things voluntarily because it shares the same views, that's one case. But we don't know, and we're entitled to discovery because we have alleged plausible allegations that state a plausible claim of joint action and coercion under this court's precedence, and we precisely don't know and are entitled to target a discovery to find out, well, was it independent? What did the White House say in those communications that they have that we don't have? What did the CDC say in the communications that they have that we don't have to find out precisely? Was it independent, voluntary, or were they being told? Were they under threat? Was there an agreement? What did they agree to? But then what stops them? Going back to the hypothetical I asked you when you were up the first time, what stops the person when the New York Times won't run his op-ed, like he can sue them and now he gets discovery and he can find out, like they have to divulge all of their communications with the administration because he can allege, like, well, I think if I got discovery I could prove that he really had an agreement with them. That seems hard to believe, but isn't that the, why is this different from that? I would say it's different because in this case we have the White House saying and the CDC saying we have entered into a partnership with these companies to do the thing we're trying to do, which in this case is censor COVID, so-called COVID misinformation. So we have statements by both parties. We have entered into a partnership with them. If the government said we have entered into a partnership with the New York Times to do X, Y, and Z, this would raise serious issues. And if the government says we've entered into a partnership with Facebook for them to clamp down on, get rid of what we're calling COVID misinformation, this states a plausible claim of the government getting too close. So these private tech platforms, as Justice Thomas pointed out in his night concurrence, now have unprecedented concentrated control over public discourse in America. If the First Amendment is going to survive, we can't let the government enter into agreements with these tech companies or coercively pressure them to use their power to censor. We have specific allegations of coercive pressure and agreement, which differentiate the case from your hypothetical. And that's what entitles us to discovery. The CDC has said we're in a partnership. Facebook, Mr. Zuckerberg himself, says we work with the CDC to take down misinformation. Facebook has said we have told the White House we will provide them with any assistance. It's not in general to take down information. So what? It's not in general. It's a statement that we are working together. That's the point that I was getting to. They could put CDC and say to Facebook, you know, we're all in this together, and we should try and get rid of this information. That doesn't tell them to do anything to Facebook. Well, you're right. I would say, and these factors are cumulative, they're additive, that where you have specific allegations of joint action through agreement, of coercive pressure through words, and are the immunity that's given by statutory. Joint agreement. I just want to be sure that I heard you correctly. The joint agreement that you're alleging was to do everything possible not to prevent the dissemination of erroneous information regarding, I guess, the pandemic. So they enter into that kind of a generalized joint agreement. We don't know. And then you're saying that provides you a basis to say that anything that's done by Facebook is somehow either coerced or makes them a joint actor with the government with respect to that specific act. What Facebook said is we will provide any assistance we can to the White House. Now, if the agreement was of this form, you tell us what to take down. We'll take it down. Surely, surely, Your Honors, that states a First Amendment claim. And we don't know if that was the agreement. We're entitled to discovery to find that out, given the statements by both White House and Facebook that they had reached out for direct engagement. And Facebook agreed to give all assistance we can to the White House's objective and request to get rid of so-called COVID misinformation, add the Section 230 immunity, add the coercive pressures. Your Honors, our position is that when these factors come together in a given case, this has got to be a plausible statement of a state action claim. So I just want to understand in terms of, and this has come down to not these members of Congress shooting their mouths off, if they'll forgive me, but to what the White House, what you just said the White House did, is that what your case comes down to? Well, I think these, you know, state actions that totality of the circumstances question, I think all these factors are additive. I don't believe they're mutually exclusive or in silos. You have strong coercive pressure. As Mr. Kennedy pointed out, these are billion-dollar destructive threats being made. You have that on top of the Section 230 immunity and on top of these agreements that have been entered into by Facebook's own admissions with the CDC and the White House. Add these factors together, Your Honors, I would suggest that a plausible claim of state action has been stated here. Thank you. Thank you very much. We thank all four counsel for their very helpful arguments, and the case is submitted.
judges: MILLER, COLLINS, Korman